DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**STATE FARM FLORIDA INSURANCE COMPANY,**
Appellant,

v.

**RICHARD MOODY, ROBERTA MOODY** and **ROBERT DENNEY,**
Appellees.

Nos. 4D13-3377, 4D14-273 and 4D14-274

[December 9, 2015]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Janis Brustares Keyser, Judge; L.T. Case Nos. 502006CA014072XX and 502007CC002907XX.

Elizabeth K. Russo of Russo Appellate Firm, P.A., Miami, and Bernstein, Chackman, Liss & Rose, Hollywood, for appellant.

Bard D. Rockenbach of Burlington & Rockenbach, P.A., West Palm Beach, and Louis M. Silber and Allison J. Davis of Silber & Davis, P.A., West Palm Beach, for appellees.

MAY, J.

Aristotle once said: "The whole is greater than the sum of all its parts." This appeal gives us an opportunity to reflect on this statement as an insurer appeals a final judgment for "Additional Living Expenses" that were incurred as a result of Hurricane Jeanne. The insurer argues that two separate trial courts erred in entering summary judgment for the insureds in these consolidated cases.[1] We agree with the insurer and reverse.

In 2004, the National Hurricane Center issued a Tropical Cyclone Report naming an upcoming storm Hurricane Jeanne. On September 24, 25, and 26, the National Hurricane Center issued hurricane warnings for Hurricane Jeanne for South Florida. On the night of September 25 and the morning of September 26, Hurricane Jeanne hit South Florida. During

---

[1] Judge Keyser and Judge Damico ruled on separate motions for summary judgment, but the cases were consolidated before Judge Keyser for the trial.

Hurricane Jeanne, the insureds' condominiums were severely damaged and became uninhabitable.

The insureds held separate condominium policies with the same insurer, including building property, personal property, and additional living expense coverages. Before section one in both policies, a notice read "Hurricane Notice–You may have no coverage or you may have limited coverage for damage caused by hurricane." Section one listed the protection for the dwelling (Coverage A), personal property (Coverage B), loss of use (Coverage C), and loss assessment (Coverage D). "Section 1 . . . Losses Insured," listed familiar perils the policy protected against, but had a section stating, "Windstorm, hail–See special hurricane coverage that follows."

The policies also contained a Hurricane Coverage Endorsement, which stated:

> There is no coverage for loss caused by a hurricane under Section I of the policy to which this endorsement is attached. No coverage is provided for accidental direct physical loss to the property described in the policy caused by a hurricane other than that which is provided in this endorsement. The provisions of this endorsement apply only in respect to loss caused by hurricane.

The Hurricane Coverage Endorsement contained "Section I – Coverages," which replaced Coverages A, B, C, and D. "Coverage C – Loss of Use," read, in part:

> 1. Additional Living Expense. When a hurricane causes the covered dwelling to become uninhabitable, we will cover the necessary increase in cost you incur to maintain your standard of living for up to 12 months. Our payment is limited to incurred costs for the shortest of: (a) the time required to repair or replace the covered dwelling; (b) the time required for your household to settle elsewhere; or (c) 12 months.
> . . . .
> Our payment will not exceed an amount equal to 10% of the Coverage B limit applicable at the time of loss.

The Hurricane Coverage Endorsement also contained the definition of "hurricane."

> When used in this endorsement:

"hurricane" means a storm system that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service. The duration of the hurricane includes the time period, in Florida:

a. beginning at the time a hurricane watch or hurricane warning is issued for any part of Florida by the National Hurricane Center of the National Weather Service;

b. continuing for the time period during which the hurricane conditions exist anywhere in Florida; and

c. ending 72 hours following the termination of the last hurricane watch or hurricane warning for any part of Florida by the National Hurricane Center of the National Weather Service.

The insurer paid the insureds their full coverage amounts on the building property and personal property coverages. Based on the Hurricane Coverage Endorsement, the insurer paid the insureds their additional living expenses, which were limited to 10% of the Coverage B (personal property coverage) limit.

In June 2006, the insureds, Richard and Roberta Moody, filed a two-count complaint against the insurer; and in March 2007, another insured, Robert Denney, filed suit. The insureds alleged in count one that the insurer breached its contract with them by providing additional living expenses coverage under the Hurricane Coverage Endorsement rather than under the general policy provisions because "the loss of use was caused by a peril other than a hurricane."

They alleged their loss was caused by a tornado or microburst, not a hurricane. They alleged their policies' Hurricane Coverage Endorsement was ambiguous and coverage should not be limited to 10% of the Coverage B (personal property coverage) limit. The Moodys requested $11,245.00 and Denney requested $10,059.10 in additional living expenses.

The insurer answered both complaints and asserted affirmative defenses. In its first affirmative defense, the insurer asserted that "[t]he [insureds'] actions [were] barred or limited by the Hurricane Coverage Endorsement of the policy." In its third affirmative defense, the insurer asserted that "[t]he [insureds] [were] barred from recovery because the tornado which allegedly caused [the] loss occurred during and was

therefore part of Hurricane Jeanne which affected [the] property on or about September 26, 2004."

The insureds and insurer all moved for summary judgment. Denney argued a tornado, not a hurricane, caused damage to his condominium so the ten percent additional living expenses limitation under Coverage C of the Hurricane Coverage Endorsement should not apply. He also argued the definition of hurricane in the Hurricane Coverage Endorsement "is limited to a hurricane, and does not include other meteorological events, such as a tornado." If the insurer "wanted to exclude tornado as part of its hurricane exclusion, it could and should have said so," and that "a hurricane can occur without a tornado, and a tornado can occur without a hurricane." He asserted that hurricanes and tornados are not synonymous as understood by an everyday person.

The Moodys made similar arguments. They also argued the insurer used only the definition of hurricane found in section 627.4025(2)(c), Florida Statutes, and not the definitions of hurricane coverage and windstorm in sections (2)(a) and (2)(b). They asserted that if the insurer used all three statutory sections in the policy, the Hurricane Coverage Endorsement would have included tornados. The Moodys attached a Citizens windstorm policy, which included all three statutory sections. They argued the insurer's choice to include only one section should be construed against it. They filed an affidavit from their daughter attesting that the attached Citizens policy was hers.

The insurer argued that its policy was unambiguous and should be given its plain and ordinary meaning. It argued the definition of hurricane was clear and damage resulting from the storm system was covered under the Hurricane Coverage Endorsement. To the insurer, the real issue was whether the tornado occurred during the storm system. No one disputed that the National Hurricane Center declared the storm system Hurricane Jeanne; the hurricane hit the insureds' condominiums on September 26, which was a day the hurricane warning occurred; and the insureds incurred losses on that day.

Separate trial judges granted summary judgment for the insureds, and denied the insurer's motion for summary judgment. Both courts found:

> If [the insurer] had included in its policy the definition of "hurricane" sections 2(a) and 2(b) in addition to Section 2(c) of section 627.4025, Florida Statutes, there would be no question that the policy's hurricane definition included tornados. If [the insurer] had intended to include tornados in

4

its Hurricane Coverage Endorsement, it should have used language clearly stating this purpose.

. . . .

The Court finds that the fact that [the insurer] had available language such as that contained in Section 627.4025, Florida Statutes and chose not to insert that language in their policy should be construed against [the insurer] and in favor of a finding of coverage. Based on [the insurer]'s failure to include the language set [forth] in Sections 2(a) and 2(b) of Section 627.4025 in its definition of "hurricane," the Court finds that the Hurricane Endorsement does not apply to losses caused by tornados.[2]

---

[2]      (2)   As used in policies providing residential coverage:

(a)   *"Hurricane coverage"* is coverage for loss or damage caused by the peril of windstorm during a hurricane. The term includes ensuing damage to the interior of a building, or to property inside a building, caused by rain, snow, sleet, hail, sand, or dust if the direct force of the windstorm first damages the building, causing an opening through which rain, snow, sleet, hail, sand, or dust enters and causes damage.

(b)   *"Windstorm"* for purposes of paragraph (a) means wind, wind gusts, hail, rain, tornados, or cyclones caused by or resulting from a hurricane which results in direct physical loss or damage to property.

(c)   *"Hurricane"* for purposes of paragraphs (a) and (b) means a storm system that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service. The duration of the hurricane includes the time period, in Florida:

1.   Beginning at the time a hurricane watch or hurricane warning is issued for any part of Florida by the National Hurricane Center of the National Weather Service;

2.   Continuing for the time period during which the hurricane conditions exist anywhere in Florida; and

3.   Ending 72 hours following the termination of the last hurricane watch or hurricane warning issued for any part of Florida by the National Hurricane Center of the National Weather Service.

§ 627.4025(2), Fla. Stat. (emphasis added).

The consolidated cases proceeded to a jury trial on whether a hurricane or a tornado caused the losses. Prior to trial, the insureds moved to determine the burden of proof. The parties disagreed on which party bore the initial burden of proof. The trial judge found that "[the insureds] ha[ve] the initial burden to prove that the loss is covered under the applicable policy of insurance. The burden shall then shift to [the insurer] to prove that the loss falls within the Hurricane Endorsement of the policy."

The trial focused on facts largely irrelevant to the legal issue in this appeal. The insurer's expert testified that tornados and hurricanes were "separate meteorological phenomena." The insureds' expert testified to reasons tornados and hurricanes were different. But, he also testified that "a tornado is an element of a hurricane." He noted that there have been hurricanes, including Hurricane Jeanne, where tornados developed in the hurricane eye wall. He also distinguished between tornados in the Midwest and tornados that may occur within a hurricane.

The evidence showed that the insureds' building sustained heavy damage, while the surrounding buildings sustained minor damage. The insureds' expert opined that the damage to the insureds' building was caused by a tornado. The insurer's expert opined that the damage was caused by hurricane-force winds that hit the insureds' building, which was unprotected because it was across from a golf course.

The jury found the insurer did not prove by the greater weight of the evidence that the damage was caused by a hurricane and not by a tornado that developed during the hurricane. The trial court entered final judgment in favor of the insureds. The insureds moved for attorney's fees pursuant to section 627.428, Florida Statutes, and the trial court later entered final judgment for attorney's fees in their favor for $755,465.00 in fees and $3,600.00 in expert witness fees.

The insurer moved for entry of judgment in accordance with its motion for directed verdict and renewed motion for summary judgment. It also moved for a new trial, arguing the trial court erred in its burden of proof ruling, and in giving incorrect jury instructions and an incorrect verdict form. The trial court denied the insurer's motions. The insurer now appeals.

The insurer continues to argue that the policy is unambiguous and property damage caused by a storm system declared a hurricane by the National Hurricane Center is covered under the Hurricane Coverage Endorsement. It argues that the court erred in considering extrinsic evidence in the form of the Citizens policy to interpret the policy. It asserts

6

the ten percent coverage limitation on additional living expenses applied because the insureds' condominium losses were caused by Hurricane Jeanne.

The insureds respond that their policies provide general coverage for residential losses and a specific exclusion/limitation for hurricanes. They argue the trial court did not err in deciding the general loss provisions applied to their claims for additional living expenses. They argue the Hurricane Coverage Endorsement defines "hurricane," in part, as a "storm system," but there is nothing in the policy that defines the components of the system. They argue their loss must be caused "by" a hurricane and not just caused "during" a hurricane. If the insurer intended for the Hurricane Coverage Endorsement to apply to tornados, it could have included section 627.4025(2)(b), which defined "windstorm" as part of a hurricane including tornados.

We have de novo review. *Rodrigo v. State Farm Fla. Ins. Co.*, 144 So. 3d 690, 692 (Fla. 4th DCA 2014) (citation omitted). We also have de novo review of a trial court's ruling on a motion for directed verdict. *Gyongyosi v. Miller*, 80 So. 3d 1070, 1074 (Fla. 4th DCA 2012) (citation omitted).

"An insurance contract must be construed in accordance with the plain language of the policy." *Landmark Am. Ins. Co. v. Pin-Pon Corp.*, 155 So. 3d 432, 437 (Fla. 4th DCA 2015) (citation omitted).

> If the terms of a contract are clear and unambiguous, the court is bound by the plain meaning of those terms. Thus, where a contract is unambiguous, the parties' intent must be gleaned from "the four corners of the document." "In the absence of ambiguity, the language itself is the best evidence of the parties' intent and the plain meaning controls."

*Id.* (internal citations omitted).

With these clear rules of construction in place, we begin our review.

The Hurricane Coverage Endorsement defines hurricane as, "a **storm system** that has been declared to be a hurricane by the National Hurricane Center of the National Weather Service." (Emphasis added). There is only one reasonable interpretation of this definition. If the National Hurricane Center names a **storm system** a hurricane, the entire named **storm system**, including the elements of the storm, constitutes the hurricane.

Under the loss of use provision in the Hurricane Coverage

7

Endorsement, "[w]hen a hurricane causes the covered dwelling to become uninhabitable, [the insurer] will cover the necessary increase in cost [the insureds] incur to maintain [their] standard of living for up to 12 months," subject to the ten percent limitation. Here, the National Hurricane Center named the **storm system** "Hurricane Jeanne" and issued the policy-required hurricane warnings and watches. On September 26, Hurricane Jeanne passed over the insureds' condominiums and the **storm system** caused their condominiums to become uninhabitable. Therefore, the Hurricane Coverage Endorsement unambiguously applied.

The insureds argue the definition of hurricane is ambiguous by reference to the Citizens insurance policy, coupled with the insurer's failure to include subsections (2)(a) and (2)(b) of section 627.4025, Florida Statutes, in its policy. But, when a policy is unambiguous, there is no need to, and courts should not, consider extrinsic evidence. *Bombardier Capital Inc. v. Progressive Mktg. Grp., Inc.,* 801 So. 2d 131, 134 (Fla. 4th DCA 2001); *see Auto-Owners Ins. Co. v. Anderson,* 756 So. 2d 29, 34 (Fla. 2000). Here, the court's interpretation of the policy effectively rendered the entire Hurricane Coverage Endorsement meaningless. *See Ergas v. Universal Prop. & Cas. Ins. Co.,* 114 So. 3d 286, 289 n.1 (Fla. 4th DCA 2013) ("A term of an insurance policy should not be construed to reach an absurd result.").

Both trial courts erred in granting summary judgment in favor of the insureds and finding the policy's definition of hurricane did not include tornados spawned during a named hurricane **storm system**. The policy was not ambiguous. The trial courts should have applied the policy's plain, unambiguous language. The Hurricane Coverage Endorsement applied to the insureds' losses.

We therefore reverse and remand for entry of judgment for the insurer. The insurer has also appealed the attorney's fees and costs judgments. The insureds agree that if the judgment is reversed, the attorney's fees and costs judgments should also be reversed. We therefore reverse the attorney's fees and costs judgments.

*Reversed.*

GROSS and CONNER, JJ., concur.

\*        \*        \*

***Not final until disposition of timely filed motion for rehearing.***